**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
PUBLIC PATENT FOUNDATION, INC.,    :

         :

         Plaintiff,    :

         :    09 Civ. 5881 (RMB)

    - against -    :

         :    **FINDINGS OF FACT AND**

GLAXOSMITHKLINE CONSUMER    :    <u>**CONCLUSIONS OF LAW**</u>

HEALTHCARE, L.P.,    :

         Defendant.    :
-------------------------------------------------------------x

## I.    Background

On June 26, 2009, Public Patent Foundation, Inc., a not-for-profit corporation affiliated

with Benjamin N. Cardozo School of Law ("Plaintiff"), filed a <u>qui tam</u> complaint against

GlaxoSmithKline Consumer Healthcare, L.P. ("Defendant" or "GSK"), alleging that Defendant

had violated the False Marking Statute, 35 U.S.C. § 292, since January 2005 "by marking certain

[of its] products with [the] patent numbers of expired patents."  (Compl., dated June 26, 2009,

¶ 2; Am. Compl., dated Oct. 15, 2010 ("Amended Complaint"), ¶ 2.)  Specifically, Plaintiff

claims that Defendant improperly labeled two Citrucel brand fiber therapy products with patent

numbers 4,626,287 ("287 Patent") and 4,671,823 ("823 Patent," and collectively, "Patents") after

the Patents had expired on January 29, 2005, "for the purpose of deceiving the public into

believing that [the Citrucel products were still] covered by . . . the . . . [P]atents."  (Am. Compl.

¶¶ 2, 13–18, 37–38; <u>see, e.g.</u>, Pls. Exs. 71, 77.)[1]

"In the fall of 2009, after receiving notice of [this] lawsuit, GSK removed the 287 and

823 [P]atent markings from its Citrucel consumer products."  (Jt. Pre-Trial Order, dated May 6,

---

[1]      By Decision and Order, dated March 22, 2011, the Court granted Defendant's motion,
dated October 29, 2010, to dismiss Plaintiff's claims related to a third patent, 4,732,917 ("917
Patent").

2011 ("JPTO"), § VI.E ("Stipulated Facts").)  Since the filing of this lawsuit, GSK has also "implemented a procedure to identify expired patents and remove them from GSK products after expiration."  (Aff. of Theodore Furman, dated May 20, 2011 ("Furman Aff."), ¶ 12.)[2]

On April 5, 2011, Defendant answered the Amended Complaint.  Defendant acknowledges that, "for a period of time" after the Patents' expiration on January 29, 2005, Citrucel products "included labeling . . . listing [the Patents]."  (Answer, dated Apr. 5, 2011 ("Answer"), ¶¶ 14–17.)  Defendant denies that GSK marked the labels with expired Patents either with knowledge that the Patents had expired <u>or</u> for the purpose of deceiving the public in violation of § 292.  (Answer at 17 ("Neither GSK nor any agent or employee of GSK possessed the requisite knowledge or intent required to have marked any products, product packaging, or product literature with the [P]atents . . . so as to violate 35 U.S.C. § 292.").)

In preparation for a bench trial (which was held on June 6, 2011), the parties submitted to the Court a joint pre-trial order, trial exhibits, motions <u>in limine</u>, and accompanying memoranda of law.  (<u>See</u> JPTO; Pl. Exs. 1–101; Def. Exs. 1–56; Def. Mots. <u>in Limine</u>, dated May 6, 2011; Def. Mem. of Law and Summ. J. Issues, dated May 6, 2011 ("Def. Mem."); Pl. Mem. of Law in Opp'n to Def. Mots., dated May 20, 2011 ("Pl. Mem.")).[3]  On May 23, 2011, Plaintiff submitted deposition designations in lieu of any direct testimony of four witnesses:  Theodore Furman

---

[2]     On June 10, 2010, nearly one year after this lawsuit was commenced and after Defendant had voluntarily ceased marking Citrucel products with the Patents, the United States Court of Appeals for the Federal Circuit held as a matter of first impression that "[a]rticles marked with expired patent numbers are falsely marked" for purposes of § 292.  <u>Pequignot v. Solo Cup Co.</u>, 608 F.3d 1356, 1360–62 (Fed. Cir. 2010); (<u>see also</u> Am. Compl. ¶ 31.)  Some district courts have applied the Federal Circuit's ruling in <u>Solo Cup</u> retroactively, <u>i.e.</u>, to markings which were made, as here, prior to the issuance of that decision.  <u>See, e.g.</u>, <u>Hollander v. Timex Grp. USA, Inc.</u>, No. 10 Civ. 429, 2011 WL 1399806, at *10 (E.D. Pa. Apr. 13, 2011); <u>Heathcote Holdings Corp. v. Walthers</u>, -- F. Supp. 2d --, 2011 WL 874148, at *2 (N.D. Ill. 2011).

[3]     Motions <u>in limine</u> and objections to Plaintiff's exhibits are resolved in a chart entitled "Summary of Rulings re: Motions In Limine & Exhibits" which is attached hereto as Exhibit A.

("Furman"), the head of consumer products patent attorneys at GSK; Dara Dinner ("Dinner"),

also a patent attorney at GSK who was supervised by Furman; Andrea Burke ("Burke"), also a

patent attorney at GSK; and Michael McCormick ("McCormick"), the director of marketing for

GSK's "Advantage Brands," a product line which includes Citrucel.  Plaintiff also submitted an

affidavit, dated May 20, 2011, in lieu of direct testimony of Plaintiff's proposed expert witness,

David Garrod, Ph.D. ("Garrod"), who has also served as one of Plaintiff's own trial attorneys

since this case was filed.  According to Plaintiff, "[t]he central thrust of Dr. Garrod's testimony

goes right" to the "key issue in this case," i.e., "whether GSK knew that its falsely marked

[P]atents were expired."  (Pl. Mem. of Law in Opp'n to Def. Mot. to Exclude Garrod, dated May

20, 2011, at 2, 4.)

On May 20, 2011, Defendant submitted affidavits in lieu of direct testimony of four

witnesses:  Furman, Dinner, McCormick, and Linda Schneider ("Schneider"), an attorney at

GSK who does not do patent work.  On May 31, 2011, Defendant submitted counter-designated

deposition testimony of Burke.  Defendant also submitted memoranda, dated May 6, 2011 and

May 31, 2011, respectively, opposing Garrod's proposed expert testimony on the grounds that,

among other reasons, "a lawyer should not testify as an expert witness about the very matters he

helped develop as a lawyer-advocate."  (Def. Reply Mem. of Law in Supp. of Mot. to Exclude

Garrod's Testimony, dated May 31, 2011, at 6–7 ("[Garrod] has co-authored the [c]omplaint[s],

actively taken discovery, participated in designating direct deposition testimony, authored his

own testimony, and prepared pre-trial and trial argument.").)  Defendant also argued that

Plaintiff "ha[d] failed to provide . . . Dr. Garrod's qualifications," and that Garrod's "proposed

testimony . . . merely recite[d] factual and legal conclusions," consisted of "speculation," and

was not drawn from "reliable expert methodology."  (Def. Mem. of Law in Supp. of Mot. to

Exclude Garrod's Testimony, dated May 6, 2011, at 3, 4, 6.)

At the trial, the Court had an excellent opportunity to observe witness demeanor and

assess witness credibility during the cross examination and re-direct examination of Furman,

Dinner, McCormick, and Schneider (all of whom the Court found to be credible).

**Garrod's Proposed Expert Testimony**

Before the trial began on June 6, 2011, the Court excluded Garrod's affidavit in lieu of

direct testimony for several reasons:  First, Garrod's testimony could "hardly be considered

independent of his client's due to his role as attorney of record in [this] action" which included

taking the depositions of at least two of Plaintiff's four witnesses.  (Tr. of Pre-trial Conf., dated

May 31, 2011, at 4:15-17); see Ziggity Sys., Inc. v. Val Watering Sys., 769 F. Supp. 752, 807

(E.D. Pa. 1990) ("[An attorney with] a direct interest in the . . . case . . . lacks credibility from

that deficiency only."); Lippe v. Bairnco Corp., 288 B.R. 678, 688 (S.D.N.Y. 2003).  Second, in

his proposed testimony, Garrod "improperly . . . assume[d] the role of advocate[] for

. . . [P]laintiff's case by arguing as to the intent or motives underlying the conduct of

. . . Defendant."  (Trial Tr., dated June 6, 2011 ("Tr."), at 3:24–4:1; see, e.g., Garrod's Decl.,

dated May 20, 2011 ("Garrod Decl."), ¶ 22 (where Garrod concludes that "the evidence clearly

demonstrates GSK's awareness of its obligation to cease using the numbers of expired

patents.")); Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469–70 (S.D.N.Y.

2005).  Garrod's affidavit was also "largely speculative or conjectural."  (Tr. at 5:1-2; see, e.g.,

Garrod Decl. ¶ 30 ("GSK had plenty of in-house patent talent that knew, or should have known,

better.")); Taylor v. Evans, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997)

("[M]usings as to Defendant's motivations . . . would not be admissible if given by any

witness—lay or expert."). And, it included "impermissible legal conclusions." (Tr. at 5:23-24; see, e.g., Garrod Decl. ¶ 23 ("An[] objective indication of GSK's deceitful intent is its extensive use of the false labeling 'Citrucel is different: Citrucel is protected by patents.'")); In re IPO Sec. Litig., 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("[W]hile an expert may provide an opinion to help a jury or a judge understand a particular fact, he may not give testimony stating ultimate legal conclusions based on those facts."); (see also Tr. at 2–7 for a complete record of the Court's reasons for excluding Garrod's testimony.)

Immediately after the Court's ruling excluding Garrod's testimony, Defendant stated its intention to "make a motion for judgment as a matter of law" pursuant to Federal Rule of Civil Procedure 52(c).[4] (Tr. at 8:20–9:1 (DEF. COUNSEL: "[W]e feel that at an appropriate time we should make a motion for judgment as a matter of law, but . . . with the Court's permission we'll make that motion at the conclusion of all evidence." COURT: "All right.").)

On June 13, 2011, Plaintiff submitted post-trial proposed findings of fact and conclusions of law without expressly addressing Defendant's proposed Rule 52(c) motion. (See Pl. Proposed Findings of Fact and Conclusions of Law, dated June 13, 2011 ("Pl. Findings").) On June 20, 2011, Defendant submitted post-trial proposed findings of fact and conclusions of law, along with a memorandum supporting its motion for judgment as a matter of law. (See Def. Proposed

---

[4] At the close of trial, Defendant again sought to move for judgment as a matter of law. (See Tr. at 118:25–119:9 (COURT: "You indicated earlier that you wanted to make a motion for directed verdict essentially. Why don't you just include that in the post trial submissions." DEF. COUNSEL: "Just as long as it's clear we would make that motion now and we're not waiving it by not raising it." COURT: "The record will so reflect.").)

Although Defendant cites Fed. R. Civ. P. 50 as the basis for its motion, since this is a bench trial, Fed. R. Civ. P. 52(c) governs. See Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 971 (2d Cir. 1998); Jackan v. N.Y. State Dep't of Labor, No. 97 Civ. 483, 1998 WL 760266, at *6 (N.D.N.Y. Oct. 26, 1998).

Findings of Fact and Conclusions of Law, dated June 20, 2011 ("Def. Findings"); Def. Mem. of

Law in Supp. of Proposed Findings, dated June 20, 2011 ("Def. Mem. II").)

In support of its Rule 52(c) motion, Defendant argues that Plaintiff has failed to meet its

burden of establishing false marking under § 292.  While acknowledging that Citrucel labels

were marked with expired Patents, GSK contends (persuasively) that Plaintiff "did not adduce

evidence that any GSK employee had actual knowledge that Citrucel products were marked with

expired Patents."  (Def. Mem. II at 13, 17.); see S.F. Tech., Inc. v. Hi-Tech Pharmacal Co., 10

Civ. 3630, 2011 WL 477729, at *3 (E.D.N.Y. Feb. 4, 2011) ("[A §] 292 plaintiff [is required] to

establish that there was misrepresentation, and to prove that the defendant knew that the marking

was false." (citing Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347 (Fed. Cir. 2005)));

Solo Cup, 608 F.3d at 1362.  "Neither Mr. Furman, Ms. Dinner, nor Ms. Burke recall knowing

the expiration date of the 287 and 823 [P]atents at any point in time."  (Def. Mem. at 11–12.)

"Mr. McCormick did not know that the [P]atents included on the Citrucel [labels] were expired."

(Def. Mem. at 14.)  In sum, Plaintiff lacks any evidence that any GSK employee knew that the

markings at issue were false.  (See Def. Mem. at 1.)  Accordingly, Plaintiff "lacks any evidence

that any GSK employee possessed an affirmative intent to deceive the public."  (Def. Mem. at 1.)

Plaintiff counters that "[t]here is substantial evidence in this case that shows Defendant

either had knowledge of the falsity of its marks or, at minimum, did not have a reasonable belief

that its Citrucel articles were properly marked."  (Pl. Findings ¶ 54.)

**For the reasons set forth below, Defendant's motion for judgment as a matter of law**

**is granted.  And, assuming arguendo that Plaintiff had established Defendant's "knowledge**

**of falsity," Clontech, 406 F.3d at 1352, the evidence adduced at trial showed that GSK did**

not mark Citrucel labels with expired Patents "for the purpose of deceiving the public," 35 U.S.C. § 292(a).

## II.    Legal Standard

"Rule 52(c) provides in pertinent part that '[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim . . . that cannot under the controlling law be maintained . . . without a favorable finding on that issue . . . ." MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 157 F.3d 956, 959 n.2 (2d Cir. 1998) (quoting Fed. R. Civ. P. 52(c)); see Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996).  Rule 52(c) "authorize[s] a dismissal at the close of the plaintiff's case if the plaintiff ha[s] failed to carry an essential burden of proof."  LaMarca v. United States, 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998); see Wechsler v. Hunt Health Sys. Ltd., 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004).

To meet its burden under § 292, a plaintiff must show "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity." Clontech, 406 F.3d at 1352; see Presidio Components, Inc. v. Am. Technical Ceramics Corp., 723 F. Supp. 2d 1284, 1332 (S.D. Cal. 2010).  Accordingly, "[w]ithout evidence that [the defendant] knowingly marked its [products] with expired patents," a plaintiff's claim for false marking under § 292 must fail. Timex, 2011 WL 1399806, at *10.

## III.    Analysis

### (1) Defendant's Rule 52(c) Motion

Plaintiff's evidence – consisting principally of the deposition testimony of Furman, Dinner, Burke, and McCormick, and Citrucel product label exhibits (see Ex. A) – does not establish false marking under § 292.  See, e.g., Timex, 2011 WL 1399806, at *10.  While it is

undisputed, under Solo Cup, 608 F.3d at 1362, that Plaintiff has shown "false marking" because the Patents appeared on Citrucel labels after their expiration in January 2005 (see Answer ¶¶ 14–17), Plaintiff has failed to show "knowledge" by Defendant that the Patents appearing on its labels had, in fact, expired, Solo Cup, 608 F.3d at 1362; see Timex, 2011 WL 1399806, at *10; In re BP Lubricants USA Inc., 637 F.3d 1307, 1312 (Fed. Cir. 2011).

First, Plaintiff's (own) evidence demonstrates that GSK's attorneys did not review Citrucel product labels and were not aware that such labels were marked with expired patents between 2005 and 2009.  (See Dep. Tr. of Dinner, dated Feb. 18, 2011 ("Dinner Dep."), at 76:1-4 (DINNER: "I did not . . . have anything to do with the [Citrucel label] review process."), 114:7-25 (PL. COUNSEL: "So it's fair to say . . . that you had nothing to do with the continued marketing of Citrucel products with the 823 and 287 patent numbers after the expiration of the products?"  DINNER: "I did not review the labels."); Dep. Tr. of Furman, dated Feb. 3, 2011 ("Furman Dep."), at 16:13–20:20 (FURMAN: "I didn't have any direct responsibility for Citrucel." . . . PL. COUNSEL: "[T]o your knowledge Ms. Dinner was never asked to review a single Citrucel label from 2002 until the filing of this lawsuit?"  FURMAN: "Not that I'm aware of."), 75:9-15 (PL. COUNSEL: "So you're not aware of any efforts, if any, by GSK to promote bulk Citrucel products as patented?"  FURMAN: "That's correct."  PL. COUNSEL: "Or any effort to describe bulk Citrucel products as protected by patents?"  FURMAN: "I'm not aware of that."); Dep. Tr. of Burke, dated Mar. 21, 2011 ("Burke Dep."), at 140:3-8 (BURKE: "I don't really remember the particulars of [any Citrucel labeling issues].").)  Indeed, Plaintiff concedes that "every label" created between 2005 to 2009 was "created without consult[ing] a competent patent attorney."  (Pl. Mem. at 5); see Timex, 2011 WL 1399806, at *10 (where plaintiff offered

no evidence that defendant's attorneys were aware that defendant's promotional materials featured expired patent numbers); Heathcote, 2011 WL 874148, at *2.

Plaintiff's only other witness, McCormick, also demonstrated a lack of knowledge of the patent contents of the Citrucel labels, testifying at trial that "I don't believe we ever touted our products as patented." (Tr. at 117:17.) He also said credibly that "I wasn't one of the parties" that placed patent-related messaging on Citrucel labels. (Tr. at 117:18–118:9 (PL. COUNSEL: "Why did [GSK] use the phrase 'Citrucel is different. Citrucel is protected by patents'?" COURT: "If you know." McCORMICK: "I do not know." PL. COUNSEL: "That's all I have, your Honor.").) And, there is no evidence that McCormick, a marketing director at GSK, had any training in patent law or ever sought counsel's advice about what GSK could or could not include on Citrucel packaging. (See Dep. Tr. of McCormick, dated Mar. 9, 2011 ("McCormick Dep."), at 51:3-17 (PL. COUNSEL: "Do you know who sits on the [product packaging] copy review committee?" McCORMICK: "I do not." . . . PL. COUNSEL: "What awareness do you have of the process [used to authorize marketing content]?" MCCORMICK: "None."), 65:3-5 (McCormick was not responsible for "legal compliance of the selling points [on Citrucel labels].");  Timex, 2011 WL 1399806, at *8.[5]

Plainly, none of Plaintiff's witnesses focused on the substance of the Citrucel products' patent markings. See Heathcote, 2011 WL 874148, at *2 ("[Where a] defendant's attorneys were involved in the [initial] assignment of . . . intellectual property [to the defendant's products but] . . . did not review . . . [the products' subsequent] packaging," and where the employees who

---

[5] GSK's copy review committee, established before this lawsuit was filed, "reviews and approves claims made about [GSK's] products in advertising." (Aff. of Linda Schneider, dated May 20, 2011 ("Schneider Aff."), ¶ 7.) "[T]he copy review committee doesn't review labels" and "doesn't include any patent attorneys." (Tr. at 46:2-24.) The committee "includes a member of GSK's legal operations department[,] . . . members of the medical and regulatory teams," and usually "brand managers and other business people for a given product." (Schneider Aff. ¶ 8.)

did review product packaging did not "seek counsel's advice on what [they] could or could not include on such packaging," it cannot be said that anyone employed by defendant was aware that defendant's packaging was marked with expired or inapplicable patents.).

Second, even if Plaintiff's witnesses had known between 2005 and 2009 that the Patents appeared on Citrucel labels – which Plaintiff has not established – Plaintiff still fails to meet its burden under § 292 because Plaintiff's case is devoid of evidence that any GSK employee was aware that the Patents had expired on January 29, 2005.  In 2000 (five years before the Patents expired), Dinner determined that Citrucel was covered by the 287 and 823 Patents and that, at that time, it was appropriate to mark Citrucel products with the Patents.  (See Dinner Dep. at 70:19-23, 75:5–76:15.)  But, Plaintiff adduced no evidence that Dinner determined the Patents' eventual expiration date during her 2000 review or that, assuming she did have such knowledge in 2000, "years later at the actual time of expiration, [Dinner] retained the specific knowledge of those [Patents'] expiration dates."  (Def. Mem. at 1; see Tr. at 113:5-6 (DINNER: "[In 2000, w]e were [only] looking into whether or not [the] [P]atents would in fact cover [Citrucel] products.").)  Dinner was never asked to review, nor did she review, the Patents' placement on Citrucel labels at any time after 2000.  (See Def. Mem. at 1; Dinner Dep. at 70:6–71:19.)

Likewise, Plaintiff presents no evidence that Furman (who began working at GSK in 2002), or Burke (a patent attorney who does not regularly handle issues related to Citrucel), or McCormick (a marketing director) had any knowledge whatsoever of the Patents' expiration date(s).  (See Furman Dep. at 16:13-21 (FURMAN: "[Citrucel] was handled by . . . Dinner."  PL. COUNSEL: "Okay.  And so to the extent you dealt with Citrucel, it would have been through reports coming up from Ms. Dinner?"  FURMAN: "Correct."), 67:2–68:25 (PL. COUNSEL: "So you're not aware of any instance when [general in-house attorneys] would have asked [whether]

it [was] still appropriate to [have] these [P]atent numbers on [the Citrucel products]?"
FURMAN: "No."); Burke Dep. at 152:7 (BURKE: "I have no idea [why language may have
been changed on Citrucel labels in 2005 and 2006]."); McCormick Dep. at 51:13-14
(McCORMICK: "[I am n]ot specifically aware of what the . . . [patent review] process is.")); see
Timex, 2011 WL 1399806, at *10.

  In sum, Plaintiff's evidence does not show that a single person in Defendant's employ
knew that Citrucel products contained false (i.e., expired patent) markings between 2005 and
2009.  (See Pl. Exs. 57, 58, 59, 62, 70, 71, 73, 75, 76); Heathcote, 2011 WL 874148, at *4.

  Finally, Plaintiff argues that GSK "did not have a reasonable basis to believe [the
Citrucel labels] were true, and thus knowledge of falsity . . . is established."  (Pl. Mem. at 5
(citing Clontech, 406 F.3d at 1352).)  In fact, Defendant's employees did have a reasonable basis
to believe its labels were "properly marked (i.e., covered by a patent)," Clontech, 406 F.3d at
1352–53, based upon Dinner's legal determination in 2000 that Citrucel was covered by the 287
and 823 Patents.  (See Dinner Dep. at 70:19-23, 75:5–76:15.)  It was not until June 10, 2010 that
the Federal Circuit first established in Solo Cup that products "marked with expired patent
numbers are falsely marked" for purposes of § 292.  Solo Cup, 608 F.3d at 1362.  As Furman
credibly testified at trial, "[i]t was not [o]n [GSK's] radar screen to track patents as far as their
expiration because [based on] our reading of [§ 292] at that time we did not see it as an
obligation or requirement to remove patents that had been properly affixed in the first place."
(Tr. at 14:11-15).  Defendant contends that "[i]t strains credulity to argue that [Defendant] could
be aware of the 'falsity' of marking with an expired patent when the law had not yet been
announced."  (Def. Mem. II at 14; see Tr. at 14:9-11 (FURMAN: "Our policy regarding false
marking and marking in general was a rigorous adherence to making sure we put the right patent

numbers on the right products."); Dinner Dep. at 73:8-19 (DINNER: "I do not believe we had a policy in place for removal of patent numbers from a label upon [a] patent expiring.")); see Clontech, 406 F.3d at 1355 ("[T]he standard is whether . . . [defendant] did not have an honest good faith belief in marking its products.").[6]

      To the extent that Plaintiff attempts to replace Clontech's knowledge standard with a negligence standard, such effort fails.  See Mikityanskiy v. Podee, Inc., No. 10 Civ. 6410, 2011 WL 2038773, at *2 (S.D.N.Y. May 24, 2011).  Section 292 requires a showing that a defendant "engaged in more than negligent action."  Id. (quoting BP Lubricants, 637 F.3d at 1311). Plaintiff failed to present proof that GSK "knowingly" marked Citrucel with the expired Patents. See supra pages 8–11.  It would not have been sufficient for Plaintiff to show, assuming arguendo that it had done so, that GSK had "unreasonably" or "negligently" mismarked its labels.  Timex, 2011 WL 1399806 at *10; id. at *8 (Section 292 "requires more than carelessness.") (citing Heathcote, 2011 WL 874148 at *4).  Plaintiff has also failed to meet its burden of proving that GSK "did not have an honest good faith belief in marking its products."[7] Clontech, 406 F.3d at 1355; see Presidio, 723 F. Supp. 2d at 1332 ("Notably, and fatal to [plaintiff's claim], [defendant does] not have to show anything, much less that it **did** have a 'reasonable belief,' unless [plaintiff] first me[ets] its burden" of "demonstrating '**lack** of reasonable belief.'" (emphases in original)).

---

[6]    See supra page 2 ("[A]fter receiving notice of [this] lawsuit, GSK removed the 287 and 823 [P]atent markings from its Citrucel consumer products." (quoting JPTO § VI.E)).

[7]    The "false marking" in this case took place before Solo Cup was decided, and GSK attorneys believed before Solo Cup that § 292 did not "require[ GSK] to remove patents that had been properly affixed in the first place."  (Tr. at 14:11-15); see supra page 11; see infra Findings of Fact ¶ 32.

**(2) Evidence Presented at Trial:  Post-Trial Findings of Fact & Conclusions of Law**

Assuming, <u>arguendo</u>, that Plaintiff had established Defendant's knowledge of the falsity of its Citrucel markings (and survived Defendant's Rule 52(c) motion), the Court would conclude by a (clear) preponderance of the evidence that Defendant did not mark Citrucel labels for the "purpose of deceiving the public."  35 U.S.C. § 292; <u>see</u> <u>Solo Cup</u>, 608 F.3d at 1363.[8]

**Findings of Fact**

1.  Furman, Dinner, Schneider, and McCormick, the four witnesses who testified at the trial on June 6, 2011, each offered credible testimony.

2.  GSK does not own the 287 or 823 Patents.  (<u>See</u> Aff. of Dinner, dated May 20, 2011 ("Dinner Aff."), ¶ 7; Def. Findings ¶ 7.)  GSK holds a license to the Patents, which it received as part of a technology sharing agreement entered into in 1998 with Marion Merrell Dow, now Aventis.  (Dinner Aff. ¶¶ 7–8; Def. Findings ¶ 7.)

3.  As the licensee of the Patents, GSK was not at any time responsible for "docketing, tracking deadlines, or paying maintenance fees" on the Patents.  (Dinner Aff. ¶ 11; Def. Findings ¶ 7.)

4.  The 287 and 823 Patents expired on January 29, 2005.  (<u>See</u> JPTO § VI.C.)

5.   Before GSK placed a patent number on a product label for the first time, GSK's patent attorneys (often in conjunction with outside counsel) conducted "a very careful" review of both the patent and the product.  (Tr. at 34:25–35:7.)  This process involved an examination of "the formulation of the product" "to ensure that the patent cover[ed] the product," and "an analysis of

---

[8]     Unless otherwise stated, all findings and conclusions of law supporting Defendant's Rule 52(c) motion, <u>see</u> <u>supra</u> Part III.1, are, to the extent applicable, hereby incorporated by reference in the Court's post-trial Findings of Fact and Conclusions of Law.

the product under a literal infringement test, doctrine of equivalent tests, and any other applicable law."[9]  (Tr. at 34:25–35:1-4; Def. Findings ¶ 15; Tr. at 34:25–35:4.)

6.   The Citrucel products were first marked with the Patents in 2000 after Dinner's determination, with the assistance of outside counsel, that the Patents applied to (i.e., covered) the Citrucel products.  (See Dinner Aff. ¶¶ 12–14; Def. Findings ¶ 22; Pl. Findings ¶ 5.)  GSK followed the careful practice described in ¶ 5 above in connection with its initial marking of the Citrucel products in 2000.  (See Dinner Aff. ¶¶ 12–14; Tr. at 89:19–90:4, 101:16-17; Def. Findings ¶ 16.)  After making this (patent coverage) determination, Dinner "advised the [Citrucel] brand managers to include the 287 and 823 [P]atents on the Citrucel products."  (See Dinner Aff. ¶ 15; Def. Findings ¶ 24; Pl. Findings ¶ 5.)

7.   "The decision to mark the Citrucel products was made to preserve GSK's right to pursue past damages against . . . [alleged] infringers" of the 287 and 823 Patents, including Accumed, against whom GSK brought an infringement action in 2000 ("Accumed Action").  (Pl. Findings ¶ 5; Def. Findings ¶ 22; see Tr. at 113:4-14.)

8.   Dinner does "not recall calculating the expiration date of [the Patents during her review in 2000] because it was not relevant to whether GSK could bring the suit" against Accumed for infringement of those Patents.  (See Dinner Aff. ¶¶ 25–27; Def. Findings ¶¶ 28, 29 ("[A]s long as the [P]atents were in force, the eventual expiration dates were not important to GSK at the

---

[9]      "A patent can be infringed in two ways – literally or under the doctrine of equivalents. Literal infringement requires that each feature of the patent claim is found in the accused device. Infringement under the doctrine of equivalents can be found only if the accused device contains elements identical or equivalent to each claimed element of the patented invention."  AccuScan, Inc. v. Xerox Corp., No. 96 Civ. 2579, 1998 WL 603217, at *3 (S.D.N.Y. Sept. 11, 1998) (citing Tex. Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1563 (Fed. Cir. 1996)), rev'd in part on other grounds, 76 F. App'x 290 (Fed. Cir. 2003).

time."); Tr. at 99:3-4 (DINNER: "[T]he <u>Accumed</u> [Action] did not require knowing the

expiration dates of the [P]atents.").)

9.   Dinner did not have "any role in drafting or approving any marketing/advertising

language on the [Citrucel] labels."  (Dinner Aff. ¶¶ 15, 18–19.)  Dinner has "never been

responsible for the label review process for any Citrucel product."  (Dinner Aff. ¶ 18; <u>see</u> Tr. at

110:1-4 (PL. COUNSEL: "No general lawyer or brand manager ever contacted you regarding

Citrucel labels after the original request you made [in 2000] to add the patent numbers?"

DINNER: "Not to my knowledge."); Pl. Findings ¶ 40.)

10. GSK's other patent attorneys do not recall reviewing patent markings on Citrucel labels.

(Furman Aff. ¶ 16 ("I cannot recall an instance, with respect to any product, where patent

attorneys were asked to confirm the appropriateness of patent markings that were already on a

product label."); <u>see</u> Burke Dep. at 140:3-8; Tr. at 109:8-10, 113:22-23.)

11.  GSK's process after a patent number had been placed on a product label was to have the

brand managers in the marketing department, without further involvement from any GSK patent

attorney, "decide what claims they wanted to have on the [Citrucel] product label[s]."  (Tr. at

65:14-17.)  According to Dinner's credible and undisputed testimony,

> the brand managers responsible for the products . . . work out how they want to
> put the numbers on the label.  It's not something that [the patent attorneys] have
> anything to do with.  So I'm not responsible for the label <u>per se</u>.  It's the advice
> that says please put it on the label.  So I haven't seen the labels . . . .  I'm not even
> sure I remember reviewing a label <u>per se</u> at that time [in 2000].

(Tr. at 109:10-20; <u>see</u> Aff. of Michael McCormick, dated May 20, 2011 ("McCormick Aff."),

¶ 14 ("I have never [in 27 years in marketing and sales at GSK] interacted with a patent attorney

concerning any patent issue, for any product, including the appropriateness of placing, or

retaining, a patent number on a Citrucel product.").)

12.  Labels created or updated by the marketing department were reviewed by Schneider "to ensure that [they] . . . complie[d] with GSK's internal standards for that product line" and "with FDA regulations and certain other state requirements."  (Schneider Aff. ¶ 9.)  But, "GSK did not have a practice of reassessing the appropriateness of the patent markings [when] a label was changed . . . ."  (Def. Findings ¶ 17; see Furman Aff. ¶ 16; Schneider Aff. ¶ 18; Tr. at 20:2-20, 49:7-10 (SCHNEIDER: "There's a process that's followed with respect to putting patent numbers on the products.  There was no policy prior to the time of this lawsuit that I was aware of with respect to removing patent numbers from the product.").)  GSK also had a copy review committee which "review[ed] and approve[d] claims made about [GSK] products in advertising" but "d[id]n't review labels."  (Schneider Aff. ¶ 7; Tr. at 46:17-18); see supra note 5.

13.  In 2004, GSK initiated a patent infringement action against Perrigo ("Perrigo Action"), alleging infringement of patent number 6,350,469 ("469 Patent"), and infringment of the 287 and 823 Patents.  (Def. Findings ¶ 35; Pl. Findings ¶ 6; JPTO § VI.F.)  The 469 Patent covers the caplet form of Citrucel; the 287 and 823 Patents cover the bulk form of Citrucel.  (Furman Aff. ¶ 23; Pl. Findings ¶ 6; Def. Findings ¶ 36.)

14.  GSK initiated the Perrigo Action "primarily because Perrigo began making a competing caplet laxative product that infringed on the 469 [P]atent."  (Def. Findings ¶ 39; Tr. at 21:3 (FURMAN: "[GSK's] real interest in [the Perrigo Action] was the caplet."), 39:12-14, 40:15-16 (FURMAN: "[O]ur focus was the caplet product . . . .").)  The Perrigo Action was referred to internally at GSK as the "caplet case."  (Tr. at 40:2-4.)

15.  Furman does "not recall calculating or knowing the expiration date of the [Patents] in connection with [his] work on the Perrigo [Action]."  (Furman Aff. ¶ 25; Def. Findings ¶ 40.)

He does "not believe that this information would have been relevant to whether GSK could initiate a suit against Perrigo."  (Furman Aff. ¶ 25; Def. Findings ¶ 40.)

16.  In or around April 2005, the Perrigo Action was settled.  Perrigo "agreed to stop manufacturing and shipping the caplet product.  The [Perrigo] powder products [which were alleged to infringe upon the 287 and 823 Patents] we allowed to go forward and [Perrigo] sell[s] them to this day . . . ."  (Tr. at 40:15–41:2 (DEF. COUNSEL: "In connection with the settlement, were any promises made regarding the powder product?"  FURMAN: "No, other than we dismissed that part of the action.  I mean, we just agreed to drop that.").)[10]

17.  Dinner and Furman testified that neither the Accumed Action nor the Perrigo Action alerted Defendant to the Patents' expiration date(s).  (See Tr. at 40:15–41:2, 99:3-4; Furman Aff. ¶ 25.)  This testimony is corroborated by evidence that the Accumed Action was filed in 2000 (see Pl. Ex. 79), nearly 5 years before the Patents' expiration, and that "[GSK's] real interest in [the Perrigo Action] was the caplet" form of Citrucel (Tr. at 21:3), which was covered by the 469 Patent, not the 287 and 823 (powder) Patents at issue in this case.  See supra Findings of Fact ¶¶ 8, 13–16.

18.  Three Citrucel labels presented by Plaintiff, one dated April 11, 2005 and two dated April 12, 2005, do not contain the Patent numbers.[11]  (See Pl. Exs. 64, 65, 74.)  These labels appeared on containers holding "sample packages" of Citrucel, i.e., "single serving packets that would be marked . . . not for individual sale" and that "might sit in a doctor's office with

---

[10]    GSK and its outside counsel, Weil, Gotshal & Manges, "conducted a thorough search, but ha[ve] been unable to locate a copy of the settlement agreement reached in the Perrigo Action."  (JPTO § VI.H; Tr. at 41:16–42:5.)  Plaintiff never subpoenaed Perrigo in an attempt to locate a copy of the Perrigo settlement.  (See Def. Findings ¶ 76.)

[11]    These labels were created by GSK's marketing personnel three months after the Patents' expiration.  (See Pl. Exs. 64, 65, 74; Tr. at 57:1-5, 62:2-5.)

individual packets" or "might individually be sent out with advertising materials."  (Tr. at 57:1-4, 58:16-17, 62:3-4.)

19.  The decision not to include the Patents on these three sample packet labels was made by GSK marketing personnel.  See supra Findings of Fact ¶ 11; Tr. at 57:1-5, 62:2-5 (SCHNEIDER: "It's a market decision on how [the marketing department] wants to distribute them.").)

20.  There is no evidence that GSK included the Patents on Citrucel sample packet labels prior to the Patents' expiration in January 2005.  (See Tr. 57:10-14 (SCHNEIDER: "In order to tell you whether [the Patents] were taken off of [the sample packet labels after January 2005], I'd have to see a prior label of the same product."  PL. COUNSEL: "Okay, that's fair.").)

21.  In or around 2003, GSK's marketing personnel began using the statement "Citrucel is protected by patents" on Citrucel labels.  (See Def. Demonstrative Exs. C–D-1.)

22.  In or around August 2006, the statement "Citrucel is protected by patents" was removed from Citrucel product labels.  (Tr. at 78:3-17, 82:7–83:22.)  A number of other changes were made to the labels at the same time, including the removal of "doctor recommended" and "preferred over Metamucil," and the addition of "[c]linically proven effective."  (Tr. at 78:13-14, 82:7–83:22; Def. Findings ¶ 32.)

23.  "The [GSK] brand managers made th[e] decision" to change the Citrucel labels in this fashion.  See supra Findings of Fact ¶¶ 11, 22; (Tr. at 78:5-20, 82:7–83:22.)

24.  Furman, Dinner, and Schneider all testified credibly that the first time anyone at GSK realized that expired patent numbers were included on Citrucel labels was when Plaintiff filed this lawsuit in 2009.  (See Furman Aff. ¶ 9 ("The first time that I, or to my knowledge anyone at GSK, realized that expired patent numbers were included on the Citrucel labels was when

[Plaintiff] filed this action and GSK was served with a copy of the original complaint in 2009.");
Tr. at 42:14-20; Dinner Aff. ¶ 31; Schneider Aff. ¶ 17 ("Until this lawsuit was brought to my
attention, I was not aware that expired patents were listed on the Citrucel labels.").)  Soon after
receiving notice of this lawsuit, GSK removed the 287 and 823 Patent markings from its Citrucel
consumer products.  (See JPTO § VI.E); see also supra page 2, Part III.1.

25.   The other witness at trial, McCormick, Citrucel's marketing director, also testified that,
before this lawsuit was filed, he was not "aware that Citrucel was marked with patent numbers"
and "did not know that [the 287 and 823 Patents] expired in January 2005."  (McCormick Aff.
¶¶ 15, 16.)  "[T]he only particular selling point that [McCormick] recall[s on Citrucel labels] is
the claim that Citrucel does not cause excess gas . . . because it was a point of differentiation in
that a competing brand, Metamucil, *did* cause excess gas."  (McCormick Aff. ¶ 11 (emphasis in
original).)

26.  Furman, Dinner, Schneider, and McCormick confirm that to their knowledge no person
in Defendant's employ knew that Citrucel products contained "false markings" between 2005
and 2009.  See supra Part III.1; (Schneider Aff. ¶ 17.)

27.  Furman, Dinner, Schneider, and McCormick each testified credibly that the Patents were
"[a]bsolutely not," following their expiration, left on Citrucel product labels to deceive the
public.  (E.g., Tr. at 42:21–43:8 (DEF. COUNSEL: "Are you aware of any attempts by anyone at
GSK to mislead or deceive anyone by marking the 287 and 823 patent numbers on Citrucel
products?"  FURMAN: "Absolutely not."), 85:21–86:8 (DEF. COUNSEL: "To your knowledge,
were the 287 and 823 patents intentionally left on products after expiration for the purpose of
deceiving the public?"  SCHNEIDER: "Absolutely not.").)  They were unaware of any attempt
by anyone at GSK to mislead or deceive the public by marking the Citrucel products with the

Patents.  (See Tr. at 42:21–43:8, 85:21–86:8, 114:5–115:1 (DEF. COUNSEL: "Ms. Dinner, were

the . . . 287 patent [and] the 823 patent numbers . . . placed on the Citrucel products with the

purpose of deceiving anybody?"  DINNER: "No."); McCormick Aff. ¶ 18 ("I have not intended

to mislead or deceive the public with the patent markings on the Citrucel products.").)

28.  All four witnesses at trial, three of whom were also Plaintiff's witnesses, credibly denied

any personal intent to deceive the public, or any knowledge of others at GSK who personally

intended to deceive the public, with respect to Citrucel patent markings.  (See Pl. Findings ¶ 4.)

29.  With respect to the wording "Citrucel is protected by patents," McCormick, Dinner, and

Schneider testified credibly that this language was not placed on Citrucel labels in an effort to

deceive the public.  (See Pl. Findings ¶¶ 27 ("McCormick testified that until this lawsuit he was

unaware that Citrucel was being promoted as 'protected by patents.'"), 69 (Dinner "never

considered the appropriateness of labeling Citrucel products with 'Citrucel is different: Citrucel

is protected by patents' language."); Def. Findings ¶ 55 ("Schneider believed that the 'Citrucel is

protected by patents' language was proper to include on the Citrucel labels because . . . the

Citrucel brand, as a whole, is protected by active patents even to this day.") (citing Tr. at 70:9–

71:4).)

30.  As noted, shortly after this lawsuit was filed in June 2009, GSK "remove[d] the expired

[P]atent numbers from the Citrucel products."  See supra page 2, Part III.1, Findings of Fact

¶ 24; (Furman Aff. ¶ 10 ("I worked with the group within GSK that is responsible for the

Citrucel labels to ensure that the expired patent numbers were removed from the products.");

Def. Findings ¶ 20; JPTO § VI.E.)  GSK has also, since the filing of this lawsuit, "establish[ed] a

more formalized separate patent process so that the patent attorneys . . . provide [marketing

personnel] with information with respect to the dates of patent expiration."  (Tr. at 52:2-12 (PL.

COUNSEL: "[N]ow that you know that the expired or non-expired status of a patent is a matter of concern, are patent attorneys included in [the product labeling] process?"  SCHNEIDER: "What we've done is establish a more formalized separate patent process . . . ."); see Furman Aff. ¶ 12.)

31.  In June 2010, approximately one year after this lawsuit was initiated, the United States Court of Appeals for the Federal Circuit decided Pequignot v. Solo Cup Co., 608 F.3d 1356 (Fed. Cir. 2010), holding as an "issue of first impression" that "an article covered by a now-expired patent is 'unpatented'" for purposes of § 292.  Id. at 1360, 1362.  As noted, some courts have applied the Solo Cup ruling (retroactively) to markings made before June 2010.  See, e.g., Timex, 2011 WL 1399806, at *10; see supra note 2.

32.  Furman testified that, prior to the Federal Circuit's decision in Solo Cup, GSK's

> reading of [§ 292] did not . . . provide an obligation to [remove expired patent numbers from products].  Our view was that once a patent was properly affixed with a lot of due diligence that there was no issue with leaving the patent on the product once it had expired.  So we weren't tracking it. . . .  In the summer of last year the [Federal Circuit] . . . made it clear that leaving an expired patent on a label in fact would be false mark[ing].

(Tr. at 38:1-11; see also Tr. at 110:25–111:12 (DINNER: "[U]ntil the recent set of lawsuits and [court] decisions, we had no reason . . . to be aware that . . . marking a product with a patent number that then expired was in fact a problem. . . .  I don't think there was an awareness that this was an issue."); see Dinner Dep. at 73:8-19 (DINNER: "I do not believe we had a policy in place for removal of patent numbers from a label upon patent expiring.").)

**Conclusions of Law**

1.  Section 292 provides, in relevant part, as follows:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the

same is patented, for the purpose of deceiving the public . . . [s]hall be fined not
more than $500 for every such offense.

35 U.S.C. § 292.  "The two elements of a § 292 false marking claim are (1) marking an

unpatented article and (2) intent to deceive the public."  Forest Grp., Inc. v. Bon Tool Co., 590

F.3d 1295, 1300 (Fed. Cir. 2009) (citing Clontech, 406 F.3d at 1352).

    2.  "A plaintiff may trigger a rebuttable presumption that the defendant acted with intent to

deceive by showing a combination of false marking and knowledge that the marking was false."

Timex, 2011 WL 1399806, at *7 (citing Solo Cup, 608 F.3d at 1362; Clontech, 406 F.3d at

1353).

    3.  To rebut this presumption of intent to deceive, a defendant's burden is to show by a

preponderance of the evidence "that it did not consciously desire the result that the public be

deceived."  Solo Cup, 608 F.3d at 1363.  "Thus, a defendant may know a patent marking to be

false and yet not violate § 292 if it did not act with the requisite intent."  Timex, 2011 WL

1399806, at *11.

    4.  When, as here, the false markings at issue are expired patents that had previously covered

the marked products, the presumption of intent to deceive is weaker "because the possibility of

actual deceit and the benefit to the false marker are diminished."  Solo Cup, 608 F.3d at 1363–

64.  "After all, the products were once patented."  Id. ("The bar for proving deceptive intent

here is particularly high.").

    5.  With respect to the first element of § 292 (false marking), GSK's marking of Citrucel

products with Patents which expired constitutes "marking an unpatented article."  Bon Tool, 590

F.3d at 1300; see supra Part III.1.  This was first determined by the Federal Circuit to be the law

on June 10, 2010 in Solo Cup.  See 608 F.3d at 1362 ("[A]rticles marked with expired patent

numbers are falsely marked.").  It was not the law between January 29, 2005 and the fall of 2009, when the expired Patents appeared on Citrucel labels.

6.  As to the second element of § 292 (intent to deceive), Plaintiff has not established that any GSK employee had "knowledge that [any] statement [on Citrucel labels] was false." Id. at 1362–63; see supra Part III.1, Findings of Fact ¶¶ 24–26; (Def. Findings ¶¶ 44–49 ("From the time the 287 and 823 [P]atents expired in January 2005 until this lawsuit was filed in June 2009, no GSK employee was aware that the GSK Citrucel products were being marked with expired patents."); Furman Aff. ¶ 9 ("The first time that I, or to my knowledge anyone at GSK, realized that expired patent numbers were included on the Citrucel labels was when [Plaintiff] filed this action and GSK was served with a copy of the original complaint in 2009."); Tr. at 42:14-20; Dinner Aff. ¶ 31; Schneider Aff. ¶ 17; McCormick Aff. ¶¶ 11, 15, 16.)

7.  Because Plaintiff has failed to establish "knowledge of falsity" on Defendant's part, as discussed in Part III.1 above, much less intent to deceive the public, Plaintiff cannot succeed on its claim of false marking under § 292.  See, e.g., Timex, 2011 WL 1399806, at *10 ("Without evidence that [defendant] knowingly marked its [products] with expired patents, [plaintiff's] claims cannot [succeed]."); Heathcote, 2011 WL 874148, at *4 ("Because I conclude that defendant did not knowingly include false patent markings on [its] packaging, I need not analyze the remainder of plaintiff's legal argument, which relies on the burden-shifting [rebuttable presumption] analysis of Clontech." (internal citation omitted)); Clontech, 406 F.3d at 1352 ("Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true.").

8.   Even if, <u>arguendo</u>, Plaintiff had established knowledge of falsity (triggering a "weak" presumption of Defendant's intent to deceive the public, <u>see</u> <u>Solo Cup</u>, 608 F.3d at 1363–64; <u>S.F. Tech v. Bayer Corp.</u>, No. 11 Civ. 402, 2011 WL 2207534, at *2 (S.D.N.Y. June 6, 2011)), the Court would find in Defendant's favor because the evidence at trial showed by a wide preponderance that Defendant "did not consciously desire the result that the public be deceived," <u>Solo Cup</u>, 608 F.3d at 1363 ("[A] purpose of deceit . . . is required."); <u>see</u> <u>supra</u> Findings of Fact ¶¶ 24–29.

9.   Plaintiff acknowledges that "[a]ll four witnesses [at trial] denied any personal intent to deceive the public, or any knowledge of others at GSK who personally intended to deceive the public, with respect to Citrucel patent markings."  (Pl. Findings ¶ 4; <u>see</u> Tr. at 42:21–43:8 (DEF. COUNSEL: "Are you aware of any attempts by anyone at GSK to mislead or deceive anyone by marking the 287 and 823 patent numbers on Citrucel products?"  FURMAN: "Absolutely not."), 85:21–86:8 (DEF. COUNSEL: "To your knowledge, were the 287 and 823 patents intentionally left on products after expiration for the purpose of deceiving the public?"  SCHNEIDER: "Absolutely not."), 114:5–115:1 (DEF. COUNSEL: "Ms. Dinner, were the . . . 287 patent [and] the 823 patent numbers . . . placed on the Citrucel products with the purpose of deceiving anybody?"  DINNER: "No."); McCormick Aff. ¶ 18 ("I have not intended to mislead or deceive the public with the patent markings on the Citrucel products.")); <u>see</u> <u>supra</u> Findings of Fact ¶¶ 27–29; <u>see also</u> <u>Presidio Components, Inc. v. Am. Technical Ceramics Corp.</u>, No. 08 Civ. 335, 2010 WL 3384995, at *3 (S.D. Cal. Aug. 25, 2010) ("In the present case, just like in <u>Solo Cup</u>, . . . [defendant] effectively rebutted the presumption [of intent] when it 'provided credible evidence that its purpose was not to deceive the public' with its marking." (quoting <u>Solo Cup</u>,

608 F.3d at 1363)); <u>Bibow v. Am. Saw & Mfg. Co.</u>, 490 F. Supp. 2d 128, 129 (D. Mass. 2007)

("All the employees have indicated that . . . there was never any intent to mislead anyone.").[12]

10.  Defendant's removal of the expired Patents from Citrucel labels shortly after this lawsuit

was filed (and before the Federal Circuit had established in <u>Solo Cup</u> that articles marked with

expired patent numbers are falsely marked, <u>see</u> 608 F.3d 1362), together with Defendant's

establishment of "a more formalized separate patent process so that the patent attorneys

. . . [now] provide [marketing personnel] with information with respect to the dates of patent

expiration" (Furman Aff. ¶ 10; Tr. at 52:5-12); <u>see</u> <u>supra</u> Findings of Fact ¶ 30, also militate

against an intent to deceive the public on the part of GSK.  <u>See</u> <u>Bow Jax, Inc. v. Sims Vibration</u>

<u>Lab., Inc.</u>, No 09 Civ. 47, 2011 WL 1304623, at *5 (E.D. Wash. Apr. 6, 2011) ("[A]fter it

received notice from [plaintiff] about potential false marking claims, [defendant] worked with its

patent attorney . . . to insure conformity with the patent marking law."); <u>Heathcote</u>, 2011 WL

874148, at *2 ("[W]hen defendant learned that the [product packaging] contained expired and

inapplicable patent numbers, it created an 'action plan' to correct the errors"); <u>Laughlin Prods.,</u>

<u>Inc. v. ETS, Inc.</u>, 257 F. Supp. 2d 863, 871 (N.D. Tex. 2002) ("[A]s soon as the questionable use

of the word 'patented' was brought to [the defendant's] attention, it changed its advertising

brochures to correct any perceived problems."); <u>see also</u> <u>Solo Cup</u>, 608 F.3d at 1364

("[Defendant] has raised more than blind assertions of good faith.").

11.  Before this lawsuit was filed (and well before the Federal Circuit's ruling in <u>Solo Cup</u>),

GSK's patent department harbored the belief that "there was no issue with leaving [a] patent on

[a] product once it had expired."  (Tr. at 38:1-11; <u>see also</u> Tr. at 14:11-15.)  "[A] good faith

belief that an action is appropriate . . . can negate the inference of a purpose of deceiving the

---

[12]      Plaintiff has provided no proof that Defendant intended to deceive the public through its
markings of Citrucel products.  <u>See</u> <u>supra</u> Part III.1, Findings of Fact ¶¶ 24–29.

public." Solo Cup, 608 F.3d at 1364–65 (no intent to deceive even where defendant "was advised [by counsel] that the best case scenario was to remove the expired patent numbers"); Timex, 2011 WL 1399806, at *10; Bow Jax, 2011 WL 1304623, at *5.  Where there is "not a scintilla of evidence that [the defendant] ever ignored its counsel's advice or, more importantly, manifested any actual deceptive intent," leaving expired patent numbers on products after the patents had expired does not show a purpose of deceiving the public.  Solo Cup, 608 F.3d at 1364–65; see also W. Elec. Co., Inc. v. Stewart-Warner Corp., 631 F.2d 333, 337 (4th Cir. 1980) ("Just because a[ patent] attorney is in-house counsel does not mean that his opinions are . . . suspect."); see Gaus v. Conair Corp., No. 94 Civ. 5693, 2003 WL 223859, at *17 (S.D.N.Y. Feb. 2, 2003); Timex, 2011 WL 1399806, at *9–10

12.  GSK patent attorneys' involvement in the Accumed and Perrigo Actions in 2000 and 2004, respectively, does not establish an intent to deceive on the part of GSK because, among other reasons, neither lawsuit established Defendant's knowledge of the Patents' expiration date(s).  See supra Findings of Fact ¶ 17.  "Intent to deceive is a state of mind arising [only] when a party acts with sufficient knowledge that what it is saying is not so."  Clontech, 406 F.3d at 1352; see Timex, 2011 WL 1399806, at *10; Heathcote, 2011 WL 874148, at *4.

13.  Evidence presented by Plaintiff that certain language, including the statement "Citrucel is protected by patents" along with several other statements unrelated to the Patents, was removed from some Citrucel packaging in August 2006, see supra Findings of Fact ¶¶ 22–23, is insufficient to show Defendant's intent to deceive the public.  See Promote Innovation LLC v. Ortho-McNeil Pharm., LLC, No. 11 Civ. 607, 2011 WL 2837421, at *2 (D.N.J. July 14, 2011) ("[T]he Court agrees with several other district courts that have determined that a packaging revision does not . . . evidence a purpose of deceit.") (collecting cases); Brinkmeier v. BIC Corp.,

26

733 F. Supp. 2d 552, 653 (D. Del. 2010) ("To the extent that plaintiff is arguing that [defendant] had knowledge that the patents were expired because the packaging of these products was updated following patent expiration, this argument fails to prove [defendant] had intent to deceive the public."); Timex, 2011 WL 1399806, at *10; Shizzle Pop, LLC v. Wham-O, Inc., No. 10 Civ. 3491, 2010 WL 3063066, at *4 (C.D. Cal. Aug. 2, 2010). And, evidence that changes to Citrucel labels were made by the GSK marketing department (i.e., without input from GSK patent attorneys), see supra Findings of Fact ¶¶ 11–12, 19, 23, and that McCormick testified that "the only particular selling point that I recall [on Citrucel labels] is the claim that Citrucel does not cause excess gas" (McCormick Aff. ¶ 11), corroborate the finding that GSK employees did not intend to deceive the public by placing the expired Patents on Citrucel labels between 2005 and 2009. See Solo Cup, 608 F.3d at 1363 ("[T]he possibility of actual deceit and the benefit to the false marker are diminished [in expired patent cases]."); (McCormick Aff. ¶ 17 ("I have never personally, in 27 years, known a patent marking to have any impact on sales. I don't believe there is any relevance from a consumer perspective whether a product has patents or not.").)

## IV.    Conclusion and Order

For the foregoing reasons, the Clerk of the Court is respectfully requested to enter judgment in favor of Defendant. The Clerk is thereafter respectfully requested to close this case.

Dated: New York, New York
       August 10, 2011

_Richard M. Berman_
**RICHARD M. BERMAN, U.S.D.J.**

27

**Exhibit A**
**Summary of Rulings re: Motions In Limine & Exhibits**

| Defendant's Motion to… | Objection | Admissible Y or N | Outcome |
|---|---|---|---|
| Bar testimony of trial attorney David Garrod, Ph.D., as expert. | Qualification of expert, Argumentative, Conjectural, Speculative, Legal conclusions | No | <u>See</u> Tr. at 1–4. |
| Bar introduction of prior adverse legal decisions. | Relevance, Prejudicial | No | Not relevant; can be referenced in proposed conclusions of law if relevant. |
| Bar Plaintiff "from presenting, as probative evidence, the fact that Defendant could not locate a copy of" the <u>Perrigo</u> Settlement. | Relevance, Foundation, Prejudicial | No | Plaintiff has offered no evidence that GSK "had an obligation to timely [preserve] the <u>Perrigo</u> Settlement," or that GSK "had a culpable state of mind." <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002). |
| Bar Plaintiff from presenting, or arguing the relevancy of, the 917 Patent. | Relevance, Waste of Time | No | Relates to claims which have been dismissed.  <u>See</u> Decision & Order, dated Mar. 22, 2011; <u>Baxter Diagnostics, Inc. v. Novatek Med., Inc.</u>, No. 94 Civ. 5220, 1998 WL 665138, at *1 (S.D.N.Y. Sept. 25, 1998). |
| Bar Plaintiff from "presenting evidence [regarding] the use of the phrase 'Citrucel is different: Citrucel is protected by patents'" on the internet or on product labels. | Relevance | Yes | Evidence of wording on product labels is relevant to the issues at trial.  <u>See</u> <u>Mikityanskiy v. Thermionics, Inc.</u>, No. 11-3006, 2011 U.S. Dist. LEXIS 48696 (C.D. Ill. May 5, 2011). |
| Bar Plaintiff from presenting "third party advertising" of the phrase "Citrucel is different: Citrucel is protected by patents." | Relevance | No | "[F]alse marking actions of a third-party are [not] imputed to a patent owner."  <u>Bow Jax</u>, 2011 WL 1304623, at *4. |
| Bar Plaintiff from "presenting evidence of, or | Relevance | No | Plaintiff does not mention the coverage of the 287 and/or 823 |

| | | | |
|---|---|---|---|
| arguing, that the 287 and 823 Patents do not cover the Citrucel Products named in the complaint." | | | Patents in the Complaint or the Amended Complaint, and Plaintiff did not argue this issue in any meaningful way at trial. |

| Plaintiff's Motion to… | Objection | Admissible Y or N | Outcome |
|---|---|---|---|
| Bar ¶¶ 12–14 from direct testimony affidavit, dated May 20, 2011, of Dara Dinner because those paragraphs are alleged "selective waiver" of attorney client privilege. | Defendant is "using the advice [it] received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice." | Yes | Plaintiff's motion, which was filed on June 1, 2011, nearly one month after the May 6, 2011 deadline set by the Court for filing motions in limine, was untimely.  Also, Plaintiff's counsel consented to testimony by Dinner on otherwise privileged matters.  (See Dinner Dep. at 118:5-13.) |

**Defendant's Objections to Plaintiff's Exhibits**

| Exhibit | Description | Objection | Admissible Y or N | Outcome |
|---|---|---|---|---|
| Pl. 23 | Citrucel Label, dated, 6/15/07 with check marks | Relevance, Prejudicial, Authentication | Yes | Evidence of product labels is relevant to the issues at trial. |
| Pl. 24 | Citrucel Label, dated, 6/15/07 with signature | Relevance, Prejudicial, Authentication | Yes | Evidence of product labels is relevant to the issues at trial. |
| Pl. 26 | Citrucel Label, dated, 6/18/07 with check marks | Relevance, Prejudicial, Authentication | Yes | Evidence of product labels is relevant to the issues at trial. |
| Pl. 27 | Citrucel Label, dated, 6/18/07 with signature | Relevance, Prejudicial, Authentication | Yes | Evidence of product labels is relevant to the issues at trial. |
| Pl. 57 | Citrucel Label, dated, 12/18/03 | Relevance, Prejudicial, Authentication | Yes | Wording on product labels is relevant to the issues at trial. |
| Pl. 78 | U.S. Patent 4,732,917 | Relevance, Prejudicial | No | The 917 Patent is not an issue in this case.  See Decision & Order, dated Mar. 22, 2011. |
| Pl. 81 | Application by GSK to U.S. Patent Office, dated | Relevance, Authentication | No | Patent No. 6,465,485 is not at issue in this case. |

| | 6/21/04, to amend Patent No. 6,465,485. | | | |
|---|---|---|---|---|
| Pl. 83 | Application by GSK to U.S. Patent Office, dated 7/5/06, to amend Patent No. 5,157,129. | Relevance, Authentication | No | Patent No. 5,157,129 is not at issue in this case. |
| Pl. 84 | Ltr. from Def. Counsel to Pl. Counsel, dated 8/13/09, re:  Pl. fails to state a claim | Relevance, Prejudicial, Settlement, Hearsay | No | The Court has already resolved Defendant's arguments that Plaintiff fails to state a claim. See Decision & Order, dated Mar. 22, 2011 |
| Pl. 85 | NY Times Article, dated July 13, 2010, re: "Diabetes Drug Maker Hid Test Data, Files Indicate" | Relevance, Prejudicial, Character, Hearsay | No | The article is not related to issues at trial.  (See Tr. at 112:8-15.) |
| Pl. 86 | DOJ Release, dated Oct. 26, 2010, re: "GSK to Plead Guilty and Pay $750 Million to Resolve Criminal and Civil Liability Regarding Manufacturing Deficiencies in Puerto Rico Plant." | Relevance, Prejudicial, Character, Hearsay | No | The release is not related to issues at trial.  (See Tr. at 112:8-15.) |
| Pl. 87 | Corp. Counsel Magazine Article, dated Nov. 10, 2010, re:  "Former In-House Lawyer for GSK Indicted for Concealing Information." | Relevance, Prejudicial, Character, Hearsay | No | The article is not related to issues at trial.  (See Tr. at 112:8-15.) |
| Pl. 88 | Google Search re: "Citrucel is Protected by Patents" | Relevance, Prejudicial, Hearsay | No | Hearsay. Also, false marking actions of a third-party are not imputed to a patent owner.  See Bow Jax, 2011 WL 1304623, at *4. |
| Pl. 89 | Drugstore.com "Buy Citrucel" | Relevance, Prejudicial, Hearsay | No | Hearsay. Also, false marking actions of a third-party are not imputed to a patent owner.  See id. |
| Pl. 90 | Kmart.com "Fiber | Relevance, | No | Hearsay. Also, false marking |

| | | | | |
|---|---|---|---|---|
| | Therapy" | Prejudicial, Hearsay | | actions of a third-party are not imputed to a patent owner.  See id. |
| Pl. 91 | RiteAid Online "Buy Citrucel" | Relevance, Prejudicial, Hearsay | No | Hearsay. Also, false marking actions of a third-party are not imputed to a patent owner.  See id. |
| Pl. 92 | Amazon.com "Citrucel Fiber Therapy" | Relevance, Prejudicial, Hearsay | No | Hearsay. Also, false marking actions of a third-party are not imputed to a patent owner.  See id. |
| Pl. 94 | GSK Privilege Log | Relevance, Prejudicial | No | No documents on privilege log were offered by either party as exhibits at trial.  See, e.g., Scott v. Cellco P'ship, No. 98 Civ. 7245, 2006 U.S. Dist. LEXIS 8350 (S.D.N.Y. Mar. 1, 2006); see also Plaintiff's consent to Defendant's privilege assertion (Dinner Dep. at 118:5-13). |
| Pl. 95 | Emails, dated Mar. 9–Mar. 12, 2011, between Pl. and Def. Counsel re:  seeking an extension for JPTO, seeking Perrigo Settlement. | Relevance, Prejudicial, Hearsay | No | Hearsay.  See, e.g., Bouchard v. N.Y. Archdiocese, 719 F. Supp. 2d 255, 259 n.8 (S.D.N.Y. 2010). |
| Pl. 96 | Emails, dated Apr. 7–Apr. 27, 2011 between Pl. and Def. Counsel re:  Perrigo | Relevance, Prejudicial, Hearsay | No | Hearsay. Id. |
| Pl. 97 | Amicus Brief of 78 Intellectual Prop. Law Professors re: Anticompetitive Settlements, dated Nov. 29, 2010, filed in McGaughey v. Bayer Corp. (Cal. Ct. App.). | Relevance, Prejudicial, Hearsay | No | The brief is not related to issues at trial.  (See Tr. at 112:8-15.) |
| Pl. 98 | FTC Paper, dated June 3, 2009, re: "Anticompetitive Pay-for-Delay Settlements in | Relevance, Prejudicial, Hearsay | No | The paper is not related to issues at trial.  (See Tr. at 112:8-15.) |

| | Pharm. Indus." | | | |
|---|---|---|---|---|
| Pl. 99 | Congressional Hearing Testimony, dated May 2, 2007, re: Anticompetitive Practices in Pharm. Indus. | Relevance, Prejudicial, Hearsay | No | The testimony is not related to issues at trial.  (See Tr. at 112:8-15.) |
| Pl. 100 | Scott C. Hemphill, *Paying For Delay*, 81 N.Y.U. L. Rev. 1553 (2006) | Relevance, Prejudicial, Hearsay | No | The article is not related to issues at trial.  (See Tr. at 112:8-15.) |